```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF TENNESSEE
 2                     NASHVILLE DIVISION

 3        UNITED STATES OF AMERICA,      )
                                         )
 4                                       )
               v.                        ) Case No.
 5                                       ) 3:18-cr-00304-1
          RICHARD N. SCHOTT,             )
 6                                       ) CHIEF JUDGE CRENSHAW
                                         )
 7     - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 8                    BEFORE THE HONORABLE

 9        CHIEF DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.

10                   EXCERPT OF PROCEEDINGS

11                       June 7, 2019
       - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
12
     APPEARANCES:
13
               For the Plaintiff:  Kathryn W. Booth
14                                  Sarah K. Bogni
                                    U.S. Attorney's Office
15                                  110 Ninth Avenue S.
                                    Nashville, Tennessee 37203
16
               For the Defendant:  David Louis Raybin
17                                 Raybin & Weissman, P.C.
                                   424 Church Street
18                                 Nashville, Tennessee 37219

19                                 Matthew M. Curley
                                   Bass, Berry & Sims
20                                 150 Third Avenue South
                                   Suite 2800
21                                 Nashville, TN 37201

22   PREPARED BY:
                        LISE S. MATTHEWS, RMR, CRR, CRC
23                        Official Court Reporter
                          801 Broadway, Room A839
24                          Nashville, TN 37203
                       lise_matthews@tnmd.uscourts.gov
25
```

1            I N D E X

2        Friday, November 22, 2019

3           INDEX OF WITNESSES

4
WITNESSES:                                    PAGE
5

6  RONALD DARCY
        DIRECT EXAMINATION BY MS. BOOTH        3
7       CROSS-EXAMINATION BY MR. CURLEY        11

8  NICOLE KATHLEEN JEFFRIES
        DIRECT EXAMINATION BY MS. BOGNI        12
9       CROSS-EXAMINATION BY MR. CURLEY        20

10
           VICTIM STATEMENTS
11

12
   JACQUELINE CRANSTON                         21
13
   DERYL JEFFRIES                              27
14
15

16

17

18

19

20

21

22

23

24

25

1          The above-styled cause came on to be heard on
2    November 22, 2019, before the Honorable Waverly D.
3    Crenshaw, Jr., Chief District Judge, when the following
4    proceedings were had, to-wit:
5               (Proceedings reported but not transcribed.)
6
7                         RONALD DARCY,
8    called as a witness by Plaintiff, was duly sworn and
9    testified as follows:
10
11          COURT DEPUTY:  Please be seated.  Please pull the
12   microphone close.
13          State your full name and spell your last name.
14          THE WITNESS:  Ronald Darcy, D-a-r-c-y.
15
16                    DIRECT EXAMINATION
17   BY MS. BOOTH:
18   Q.   Good morning, Mr. Darcy.
19          Mr. Darcy, where are you employed?
20   A.   Conrad Construction, Lebanon, Tennessee.
21   Q.   What do you do?
22   A.   Truck driver.
23   Q.   How long have you been a truck driver?
24   A.   18 and-a-half years, with them.
25   Q.   Was there a time that you had, several years ago, an

accident at work that required you to get some dental work?

A.    Yes, ma'am.  I am Lowboy operator and I move heavy

equipment, and I had loaded a machine on the Lowboy.  And I

turned to get out of the machine after I loaded it, and I

fell approximately eight to ten feet.

Q.    And what happened to you as a result of that fall?

A.    The -- my front teeth on the bottom had become extremely

loose.  And I could barely eat because they were so loose,

and it was very painful.

Q.    Did you seek dental care for those loose teeth that

happened as a result of your fall?

A.    Yes, ma'am.

Q.    Where did you go to seek dental care?

A.    I went to Lebanon Dental Excellence on West Main Street

to see if they could help.

Q.    Okay.  And what happened when you went there?

      Did you get dental care?

A.    Yes, ma'am.  Originally he said that they would have to

come out, but he could prolong them and tighten them back up

if he put this stuff on it to hold them together.

Q.    And when you say "this stuff," do you know what "this

stuff" was?

A.    To me it was like white superglue.

Q.    And the dentist you saw when you went to Lebanon Dental

Excellence was not Dr. Schott; is that correct?

1  A.    No, ma'am, it was not.

2  Q.    It was a different dentist?

3  A.    Yes.

4  Q.    And so he put this white superglue-like substance on

5  your teeth.

6          Did he tell you that you needed any additional

7  work done?

8  A.    Yes, ma'am.  He told me that they would eventually have

9  to come out.

10  Q.    And that is, your teeth would have to come out?

11  A.    Yes.  And at that time I paid him for putting that stuff

12  on my teeth and he gave me an estimate, what I thought was an

13  estimate, of $2600.

14  Q.    And that was to take your teeth out.  And were there

15  some other services that were to be performed?

16  A.    That was to extract the teeth and put a full plate in

17  the bottom.

18  Q.    And approximately when was this?  What year?

19  A.    I'm going to say -- oh, Lord.  I think it was around

20  2017.

21  Q.    Did you ultimately go back to Dental Excellence to get

22  that $2600 worth of work done?

23  A.    No, ma'am, I did not.

24  Q.    And let me back up for just a second.

25          Did you have dental insurance?

1  A.    Yes, ma'am.

2  Q.    And who was your dental insurance through?

3  A.    Delta Dental.

4  Q.    And was that under your -- coverage at your wife's work?

5  A.    Yes, ma'am.

6  Q.    So you were saying that you did not go back to Dental

7  Excellence to get the teeth extracted or the plate.  Why not?

8  A.    Because the stuff he had put on my teeth created more

9  and more problems and everything become looser and more

10 painful.  Only later I found out that it was actually doing

11 something to the nerves.  It was rotting the teeth and the

12 nerves from below the gum line up.

13 Q.    And how did you find that out?

14 A.    I went to another dentist, a Dr. Fanns.

15 Q.    About how long after you went to Dental Excellence to --

16 and got the goop put on your teeth did you go to Dr. Fanns?

17 A.    Probably about six months to a year.

18 Q.    And so you -- you went to see Dr. Fanns and what did --

19 did he do some dental work for you?

20 A.    Yes, ma'am.  He told me that they would have to come

21 out; there was nothing they could do, and would have to be

22 removed surgically.

23 Q.    And did he -- was he able to do that?

24 A.    No, ma'am.  Not at the present time because --

25 Q.    And why not?

A.    He took x-rays at everything.  And he sent an estimate

to Delta insurance and Delta said them teeth have already

been pulled.  You have no teeth there.

Q.    And is it at that point that you found out that Lebanon

Dental Excellence had already billed for that work?

A.    Yes, ma'am.

Q.    And how long did it take, approximately, for you to get

that claim resolved so that you could get the dental work you

needed?

A.    Over a year.

Q.    And during that time, were you in any amount of pain?

A.    Yes.

Q.    Can you tell the Court about that.

A.    Dr. Fanns couldn't do anything because Delta said that

they were -- they were already gone.  So they would not

authorize extracting any teeth or anything because the teeth

were not there.

Q.    Did you ever bring this up with anyone at Lebanon Dental

Excellence?

A.    Yes, ma'am.  I called them, because I kept receiving

bills for $2600, that I owed $2600.

Q.    Okay.  And what did you say when you called them?

A.    I would tell them, how come I owe this money when there

was no services ever provided?  And they said, well, it must

be.  It must be.

1    And I said, well, you know, you never pulled the
2    teeth.  And they said, well, you'll have to speak to somebody
3    in Murfreesboro.
4    Q.    And did you speak to somebody in Murfreesboro?
5    A.    And I called people in Murfreesboro.  And they would
6    say, well, we'll get back to you.  At one point they said
7    we'll get back to you.  At another point they said you'll
8    have to call Lebanon.  And it was just back and forth, back
9    and forth, back and forth.
10   Q.    Did you ever -- and approximately how many times over
11   the course of that year did you contact Lebanon Dental
12   Excellence?
13   A.    It was over a dozen.
14   Q.    Okay.  And did you ever go in to Lebanon Dental
15   Excellence to try to speak to someone in person?
16   A.    Yes, ma'am.  And that's when they said, well, you'll
17   have to go to Murfreesboro.
18   Q.    Okay.  And did you go to Murfreesboro?
19   A.    No, ma'am, I did not.
20   Q.    Did you file a claim with your own insurance company?
21   A.    I tried.
22   Q.    And after about a year, were you able to get the dental
23   work that you needed?
24   A.    Delta insurance told me that they had done something and
25   they were going to override it and allow Dr. Fanns to exact

1  the teeth.

2  Q.    And at some point did you get your teeth extracted, but

3  you weren't able to get the plate?

4  A.    Yes, ma'am.

5  Q.    And so did that mean that you lived without teeth for a

6  period of time?

7  A.    Yes, ma'am.

8  Q.    About how long was that?

9  A.    That -- that whole period was about a year.

10 Q.    And was that a direct result of the fact that Lebanon

11 Dental Excellence had already billed for that work?

12 A.    Yes, ma'am.

13 Q.    How did that impact your daily life, to not have teeth

14 on the bottom part of your mouth?

15 A.    Well, to -- I can't stand going toothless anyway, as I

16 call it.  But I am involved in different things and --

17 Q.    You're a Shriner; is that right?

18 A.    I'm a Shriner.  And I'm part of the oriental band, which

19 a lot of people say is part of the clown brigade.  And we do

20 a lot of appearances with children and stuff.  And for me to

21 be in my uniform and interacting with children, I just -- I

22 was extremely uncomfortable and embarrassed.

23 Q.    Was -- did the lack of teeth also cause you problems

24 eating?

25 A.    Yes.  Everybody knows you can't eat -- or everybody

should know you can't eat without teeth.  I mean, unless you
just want to gum your food to death.

Q.    You had mentioned that you kept receiving bills from
Lebanon Dental Excellence for $2600 for work that wasn't
performed?

A.    Yes, ma'am.

Q.    Did that have any repercussions on you and on your
credit?

A.    Yes, ma'am.  Because of that, my credit score went lower
and lower and lower because I wasn't about to pay the $2600.
And not paying just -- they had reported it to the Credit
Bureau, and my credit score started -- went low.

Q.    And did that have any repercussions on you in your life,
having a low credit score?

A.    Yes, ma'am, especially trying to buy a house.

Q.    What happened?

A.    If you don't have a credit score, you can't buy a house.

Q.    Was there a time that you were trying to buy a house and
you were unable to based on your low credit score?

A.    Yes, ma'am.

Q.    And what type of home do you live in now?

A.    I live in a mobile home now.

Q.    And is that because you weren't able to get a mortgage
for the home that you wanted?

A.    Yes, ma'am.

```
 1              MS. BOOTH:  No further questions at this time,
 2   Your Honor.
 3              THE COURT:  All right.  Cross-examination.
 4
 5                     CROSS-EXAMINATION
 6   BY MR. CURLEY:
 7   Q.   Good morning, Mr. Darcy.  I just have one question.  I
 8   think in response to the government's question in terms of
 9   when this occurred, what was your recollection of that?
10   A.   I want to say around '17 -- '16 to '17 to '18.
11   Q.   Okay.  If there were records that said it was 2014,
12   would you have any reason to dispute that?
13   A.   No, I wouldn't.  I -- I'm sorry.
14   Q.   You just don't know one way or the other?
15   A.   It could be.
16   Q.   Okay.
17   A.   It doesn't seem that long, but it very well could be.
18   Q.   Do you recall telling a government agent that it was
19   2014 that you believe you had the interaction with Lebanon
20   Dental Excellence?
21   A.   It could be 2014.
22              MR. CURLEY:  Okay.  Thank you.  That's all the
23   questions I have.
24              THE COURT:  All right.  Redirect?
25              MS. BOOTH:  No, Your Honor.
```

```
 1              THE COURT:  All right.  You can step down.
 2              (Witness dismissed.)
 3              MS. BOGNI:  The United States calls Nicole
 4    Jeffries.
 5              COURT DEPUTY:  Please raise your right hand.
 6
 7                   NICOLE KATHLEEN JEFFRIES,
 8    called as a witness by Plaintiff, was duly sworn and
 9    testified as follows:
10
11              COURT DEPUTY:  Please be seated.  Please pull the
12    microphone close.
13              State your full name and spell your last name.
14              THE WITNESS:  Nicole Kathleen Jeffries,
15    J-e-f-f-r-i-e-s.
16
17                        DIRECT EXAMINATION
18    BY MS. BOGNI:
19    Q.   Good morning, Ms. Jeffries.  How are you?
20    A.   Good.  How are you?
21    Q.   Good.  Can you tell me how old you are?
22    A.   Twenty.
23    Q.   And what do you -- what do you do for a living?
24    A.   I manage at one restaurant and then I serve nights at
25    another.
```

```
1   Q.   And where is that at?
2   A.   One is located in Mt. Pleasant, Tennessee, and the other
3   in Columbia, Tennessee.
4   Q.   Where did you grow up?
5   A.   Lebanon, Tennessee.
6   Q.   As a child, did you ever go see a dentist?
7   A.   I did, yes.
8   Q.   Did you ever go to Dental Excellence in Lebanon?
9   A.   I did, yes.
10  Q.   When you went to Dental Excellence, who was your
11  insurance company?
12  A.   TennCare.
13  Q.   Did you go to Dental Excellence with your family?
14  A.   I did.
15  Q.   Do you have siblings?
16  A.   I do.
17  Q.   How many do you have?
18  A.   I have a younger brother and a younger sister.
19  Q.   Did they go with you to the dentist?
20  A.   They did.
21  Q.   And who took you to the dentist?
22  A.   My parents, my mom and my dad.
23  Q.   And if you don't mind speaking up just a little bit.  I
24  know it's difficult.
25            When you went to the dentist, can you explain sort
```

1  of what the process was at Dental Excellence.

2  A.    First, we would wait in the waiting room in the front.

3  And then I would be called by myself to the office in the

4  back.

5  Q.    Was your mother allowed to go back with you?

6  A.    No.  She sat in the waiting room.

7  Q.    Was your father allowed to go back with you?

8  A.    No.  I was by myself.

9  Q.    Why did you go to the dentist?

10 A.    Routine cleanings, checkups.

11 Q.    Did you ever experience any tooth pain that caused you

12 to go to the dentist?

13 A.    Yeah, I did once.  I had a -- when I ate sweet things or

14 anything too cold my tooth, I would have a really sharp pain.

15 Q.    Do you recall about when this was?

16 A.    I would say I was probably 16.

17 Q.    So about four years ago?

18 A.    Yeah.

19 Q.    So when you were having this pain, did you go to Lebanon

20 Dental Excellence?

21 A.    I did.

22 Q.    What did you say was the issue?

23 A.    I told them about the issue, you know, the -- if I ate

24 anything sweet or drank anything too cold.  I remember them

25 doing a cold test just to see where the pain was located.  I

 1  did feel the pain during the test, but nothing was ever
 2  really done.  And they told me that it was okay.
 3  Q.   Do you know who told you that?
 4  A.   I don't, no.
 5  Q.   Do you know if it was actually a dentist?
 6  A.   I don't, no.
 7  Q.   What was the cold test?
 8  A.   They -- I'm not exactly sure, but they moved something
 9  cold around each one of my teeth on the side that the pain
10  was.  And they told me to tell them if it hurt.
11  Q.   And what did you say?
12  A.   Well, when it hurt, I told them it did.
13  Q.   Did they do an x-ray?
14  A.   I don't recall.
15  Q.   Did they tell you if it was a cavity?
16  A.   No.  They said that my teeth were fine every time I
17  would go.
18  Q.   So then what happened at the end of this event?  Did you
19  go back out into the waiting room?
20  A.   Yeah, I did.  I would be -- just go out into the waiting
21  room and tell my mom that they said everything was okay.
22  Q.   What happened after that?  Did you experience pain?
23  A.   Yeah, for a while.
24  Q.   About how long?
25  A.   It was actually until I went to my new dentist in

1   Columbia.

2   Q.   Okay.  So let's talk about that a little bit.

3         Did there come a time that your parents and your

4   family moved?

5   A.   Yes, there was.

6   Q.   So where did you guys move?

7   A.   We moved to Mt. Pleasant right as soon as I turned 18.

8   Q.   And at that time did you change dentists?

9   A.   I did.

10  Q.   So who -- what dentist did you go to at that point?

11  A.   Dr. Lauren Wilburn.

12  Q.   And what did you find out going to the dentist?

13  A.   During my first visit, they found cavities.  And they

14  had said that they were going to put in a request to get it

15  done through insurance.  And then they called not too long

16  after and said that my insurance was denied for the dental

17  care.  And when I went back in, they told me that it was

18  because they were -- the teeth that had cavities in them were

19  already billed for.  So that they couldn't do them again.

20  Q.   And who billed for them?  Was it Dental Excellence?

21  A.   Yes, ma'am.

22  Q.   How many cavities did they tell you that you had?

23  A.   18.

24  Q.   18 cavities?

25  A.   (Witness moves head up and down.)

1  Q.    Had all 18, to your knowledge, been billed for?

2  A.    Yeah.  They said every one had.

3  Q.    Were you able to get your cavities filled immediately?

4  A.    No.  I had to wait a little while.

5  Q.    And do you know why?

6  A.    No idea.

7  Q.    Did you eventually get the cavities filled?

8  A.    I did.  It was over a few-week period.  They took two

9  days and they filled nine cavities each time.

10  Q.    What was that experience like for you?

11  A.    Oh, it was terrible.

12  Q.    Can you explain that.  Why was it terrible?

13  A.    Well, they have to numb a whole side of your face.  They

14  chose two different days so that they only had to do one side

15  at a time.  And I had to sit there for hours at a time while

16  they just drilled in my mouth.

17  Q.    Do you suffer from any other issues related to your

18  teeth?

19  A.    Yeah.  I have a -- an overbite and a crossbite.

20  Q.    And has that been treated?

21  A.    It was going to be treated with braces.  After I waited

22  for my cavities and everything to be filled, I went to the

23  orthodontist to get braces on, yes.

24  Q.    Was there a time that TennCare paid for braces for you?

25  A.    Yes.

1  Q.   Was that delayed in getting on to your teeth?

2  A.   Yes, ma'am.

3  Q.   And why was that delayed?

4  A.   Only because I had to have cavities filled.  They

5  couldn't put braces on without those being done.

6  Q.   So once the cavities were filled, were you then able to

7  get your braces?

8  A.   Yes.

9  Q.   And who paid for that?

10 A.   TennCare.

11 Q.   What happened after that with your braces?

12 A.   I found out a few months after I got braces on that

13 TennCare stopped covering me.  And I couldn't afford them by

14 myself.

15 Q.   Do you know why TennCare stopped covering you at that

16 point?

17 A.   They basically said it was an income thing, that I

18 started making too much money when I got my second job.

19 Q.   At this point, how old were you?

20 A.   Nineteen.

21 Q.   What happened to the braces?

22 A.   I clipped them off.

23 Q.   Can you explain how you did that.

24 A.   I just popped out the wire.  I used a pair of pliers to

25 just grip them and just squeeze them as tight as I could

1   until they came off.

2   Q.    If -- if you hadn't needed the cavities to be filled,

3   could the braces have been put on earlier?

4   A.    Yes.

5   Q.    Do you still need braces?

6   A.    I do.

7   Q.    Are you able to afford those braces?

8   A.    I'm not.

9         MS. BOGNI:  One moment, Your Honor.

10        THE COURT:  Sure.

11  BY MS. BOGNI:

12  Q.    Ms. Jeffries, why did you remove the braces on your own?

13  A.    I removed them because -- originally, I had called the

14  orthodontist that I was going to to ask them to be removed

15  since I couldn't afford to take care of them, and they told

16  me that they would not do it.

17  Q.    And so you took them off yourself?

18  A.    I did.

19  Q.    And what did you use to take them off?

20  A.    Pliers.

21  Q.    Was the orthodontist going to charge you to take the

22  braces off?

23  A.    Yeah, he was, and I couldn't afford that either.  But

24  they originally said that they don't recommend taking them

25  off early.  And they kind of gave me no choice.  They said

1  that they wouldn't.

2  Q.    And was it painful to remove your braces yourself?

3  A.    Afterwards, yeah, a lot.

4           MS. BOGNI:  Those are my questions, Your Honor.

5           THE COURT:  All right.  Cross.

6

7                        CROSS-EXAMINATION

8  BY MR. CURLEY:

9  Q.    Good morning, Ms. Jeffries.  I just have one question

10 for you.

11          When you went to Lebanon Dental Excellence, do you

12 recall the dentist that saw you there?

13 A.    I do not.

14 Q.    If the records show that it was a Dr. Cosby, do you have

15 any recollection of Dr. Cosby seeing you?

16 A.    I don't.

17 Q.    But you don't recall Dr. Schott treating you at Lebanon

18 Dental Excellence, do you?

19 A.    I do remember his face.

20 Q.    Okay.  Do you remember him treating you?

21 A.    I do not.

22          MR. CURLEY:  Okay.  Thank you.

23          MS. BOGNI:  No other questions, Your Honor.

24          THE COURT:  And what's your best approximation of

25 when you first went to Lebanon Dental Excellence?  Initially

1  you said four years ago.  So you're 20.  That would have made
2  you 16.  Is that right?
3          THE WITNESS:  Yeah, that was actually towards the
4  end of my visits.
5          THE COURT:  So did you go in 2015, 2016?
6          THE WITNESS:  I believe so.
7          THE COURT:  Okay.  That's when you think you got
8  the services?
9          THE WITNESS:  Yes, sir.
10         THE COURT:  Initial services?
11         THE WITNESS:  (Witness moves head up and down.)
12         THE COURT:  Thanks.  That's all.  Anything
13  further?
14         MS. BOGNI:  No, Your Honor.
15         THE COURT:  All right.  You can step down.
16                  (Witness excused.)
17         THE COURT:  All right.  Do you want to call the
18  victim statements now?
19         MS. BOOTH:  Yes, Your Honor.  The United States
20  would call Jacqueline Cranston to the podium.
21         THE WITNESS:  My name is Jacqueline Cranston.
22  Three of my children went to Dental Excellence:  Nicole
23  Jeffries being my oldest child; Robert and Sara Jeffries
24  being my youngest two children.  I took them there for years.
25         From the first time that we went, there was a sign

on the door going back into the back where services were
rendered stating that only the patient was allowed back there
due to space issues.  I thought it was kind of odd, but I
didn't know any better.  It kind of made sense.  I took them
there for their routine cleanings every six months.  They
would tell me that there was cavities or other work that
needed done.  And we would make the appointment for that the
same day that we had the cleanings done.  And I would also
take them back to have the services done, I thought.

        After they supposedly had services done, they
would come out looking like something had been done.  But
they would still be complaining about being in pain.  I
thought it was just because they had had work done.  They had
stopped complaining about being in pain for a little while,
and they would start complaining again.  I didn't know if it
was the same tooth they were having problems with or what was
going on.  I should have listened to my children.  I didn't
know it at the time, but what was being done to them was
unfathomable.

        When we moved and saw a new dentist was when we
found out, one child at a time, what had been done.  We took
our first child to the dentist in Columbia after we had
moved.  And they said that there was a lot of work that
needed done, a lot.  And I believe our youngest child was the
one who had the first appointment there.  They said that they

would call us back after they got it preapproved with the
insurance company, and call us back and make an appointment
for it.

       With each child, when they called us back, they
said that the insurance company had already paid for all of
the work to be done that had never been done.  Over the
years, it got worse and worse.  At -- as soon as -- as soon
as we found out about the first child, I started calling
Dental Excellence.  I was always told somebody would call me
back or I needed to call back at a different time, and nobody
would ever call me back.  I never got to speak with anyone.
The only time that anyone ever tried to make things right was
when my son was supposed to have had a wisdom tooth exacted,
and they hadn't extracted it.  They asked if we could drive
back to Lebanon.  Murfreesboro at the time was more
convenient because it was closer.  So we took him there.
Dr. Schott met us there after hours to exact my son's tooth.
And we were all offered free cleanings.  They explained that
they didn't know how that could have happened.

       When we were finally able to get ahold of somebody
with the insurance company to get the work approved that
needed done -- my children had to miss school -- a lot.  They
wouldn't do the work all at the same time.  So we were having
to go back every one or two weeks to have stuff done.  Their
grades were affected greatly.  I missed a lot of work taking

1  them back and forth.

2       My son's front tooth is black.  It's black now.

3  Because the cavity got so bad that he had to have a root

4  canal.  And he needs a crown.  And I can't pay to give him

5  the crown.  So they did the root canal and just let his tooth

6  go black.  My daughter Nicole needed braces and couldn't get

7  them put on in a timely fashion because she had to have so

8  much work done in her mouth.  I just found out last week that

9  she took her braces off herself.  I thought that she had paid

10 somebody to do it.  It's hard for any of us in our family to

11 trust health care providers now because when you take your

12 child to the dentist or a doctor, you trust them, and you

13 can't after someone has broken that trust.

14      Mr. Schott did this to children.  He damaged my

15 children for the rest of their life.  He caused them so much

16 suffering.  And I want him to receive the maximum punishment

17 available.  He hurt children.

18      Thank you, Your Honor.

19      THE COURT:  Well, thank -- if you could remain at

20 the podium.

21      THE WITNESS:  Yes, sir.

22      THE COURT:  Thank you for providing the

23 information to the Court.  You heard your daughter just

24 testify, Ms. Nicole Jeffries.  Did your other children

25 receive these services around the same time, 2015/2016?

1          THE WITNESS:  They went there for years before

2     that, sir.  This happened for years.

3          THE COURT:  But before 2000- --

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Can you tell me approximately how far

6     in advance?

7          THE WITNESS:  I want to say Nicole was about 10 or

8     11, maybe, when she started going there.  It was a long time.

9     It was a very long time.

10          THE COURT:  And I was a little bit -- just if you

11     could clarify a little bit -- you have two sons?

12          THE WITNESS:  I have a son.  And my youngest is a

13     girl.  She's my daughter.

14          THE COURT:  Okay.

15          THE WITNESS:  Robert Jeffries and Sara Jeffries.

16          THE COURT:  So when you said your son had the

17     wisdom tooth --

18          THE WITNESS:  Yes.  He's the one that had the

19     wisdom tooth and the root canal.

20          THE COURT:  And the root canal?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  So that's the same son?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  It's just one son?

25          THE WITNESS:  Yes, sir.

```
 1              THE COURT:  And do you remember when that
 2    approximately happened?
 3              THE WITNESS:  It was right after we moved to
 4    Columbia.  2000- -- August 2016.
 5              THE COURT:  Okay.
 6              THE WITNESS:  Is my best guess.
 7              THE COURT:  And then the services -- you received
 8    services from Schott before 2015?
 9              THE WITNESS:  I believe so, yes, sir.  Yeah.
10    Definitely.
11              THE COURT:  And you just -- you just don't know
12    how -- a few --
13              THE WITNESS:  I'm very bad with time.  I know the
14    kids weren't that old when I started taking them there.  That
15    dentist office, it was easy to get them all appointments at
16    the same time and get them in in a timely fashion if there
17    was a problem.
18              THE COURT:  Was that the regular cleanings that
19    you told me about?
20              THE WITNESS:  Yes, sir.
21              THE COURT:  And was that for anything -- any
22    services other than cleanings?
23              THE WITNESS:  Any time they told us that any other
24    work needed to be done, when we were leaving after the
25    cleaning, or if we had to go, they would ask if we wanted to
```

```
 1   make the appointment for the services that needed done right
 2   then.  And we would make the appointment and I would bring
 3   them back.
 4          THE COURT:  And then the problems that you've
 5   shared with me and your daughter shared started at least
 6   sometime in 2015?
 7          THE WITNESS:  Yes, sir.
 8          THE COURT:  All right.  Thank you.
 9          THE WITNESS:  Thank you.
10          THE COURT:  All right.
11          MS. BOOTH:  The United States calls Deryl Jeffries
12   to the podium.
13          THE WITNESS:  Good morning, Your Honor.  My name
14   is Deryl Jeffries.
15          THE COURT:  Good morning.
16          THE WITNESS:  I'm the father of Nicole, Robert and
17   Sara Jeffries.
18          Come along about 2009, I started having some
19   medical issues of my own, causing me to lose my job around
20   2013, forcing me and my wife to change roles.  I suddenly
21   began doing dishes and vacuuming rather than going to work.
22          The best of recollection, our involvement with
23   Dr. Schott began around 2013.  That would be the time I lost
24   my job where my insurance from the work failed, mandating
25   that we go on TennCare.
```

1    THE COURT:  So 2013 would have been when your
2  children were given --
3    THE WITNESS:  That's when I believe the TennCare
4  started, sir.  I'm not sure if we had them going to
5  Dr. Schott prior to that or not.
6    THE COURT:  Okay.
7    THE WITNESS:  I am not aware -- like I said, my
8  memory is not real good back then.
9    THE COURT:  That's all right.  Mine either.  But
10 you know you became TennCare eligible in 2013?
11   THE WITNESS:  Yes, sir.
12   THE COURT:  All right.  Thanks.
13   THE WITNESS:  To my recollection, dental
14 procedures were going on as normal.  I had no reason to
15 suspect otherwise.  Jacqueline seemed to have the opportunity
16 to improve her position; requiring us to move.  We went ahead
17 and moved to Columbia.  Actually, Mt. Pleasant.  Established
18 new doctors for myself, established doctors for the children,
19 dental care.  It was quite confusing.
20      At one point during the children's dentist
21 appointments, I was hearing comments being made of they can't
22 do the work because that particular work has already been
23 billed for; they can't do it again.  But the work hasn't been
24 done.  So I started to question, you know, yeah, maybe --
25 maybe there was a billing mistake, a medical coding error.

1    But another child comes up with exactly the same issues.  And

2    within a week, another child comes up, exactly the same

3    issue.  Called the dentist office, called Lebanon,

4    Murfreesboro.

5           We were finally offered a quick fix to one of the

6    problems at the Lebanon office.  Like Jacqueline said, we

7    ended up taking the Murfreesboro option.  During the

8    Murfreesboro visit, we were offered cleanings, teeth

9    inspections for the entire family at no cost.  This raises an

10   enormous red flag.  With me dealing with the medical

11   situations I have had, doctors do not offer services at no

12   cost, especially to extended family members.

13          The more I thought about it, I knew I was dealing

14   with a case of insurance fraud.  I knew something was afoot.

15   And I started making phone calls, which was rather tedious.

16   I wasn't quite believed at first, I don't think.  But

17   eventually a woman did get ahold of me, took my statement.

18   And it wasn't, maybe, a couple, three, four months later, I

19   really noticed that this started to go into an insurance

20   fraud situation.

21          I'm not concerned about how much money was made,

22   how it was made, who it was made by.  My concern is this

23   money was made and paid for at the price of innocent

24   children.  Children didn't do anything to deserve this.  It's

25   my belief a crime against children should be punishable to

1   the full extent of the law, no questions.

2           Thank you, Your Honor.

3           (Proceedings reported but not transcribed.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   REPORTER'S CERTIFICATE

2

3           I, Lise S. Matthews, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Tennessee, with offices at Nashville, do hereby certify:

6           That I reported on the Stenograph machine the

7   proceedings held in open court on November 22, 2019, in the

8   matter of UNITED STATES OF AMERICA v. RICHARD N. SCHOTT, Case

9   No. 3:18-cr-00304-1; that said proceedings in connection with

10  the hearing were reduced to typewritten form by me; and that

11  the foregoing transcript (pages 1 through 31) is a true and

12  accurate record of said proceedings.

13          This the 22nd day of November, 2019.

14

15                          /s/ Lise S. Matthews
                            LISE S. MATTHEWS, RMR, CRR, CRC
16                          Official Court Reporter

17

18

19

20

21

22

23

24

25